UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -:
CYNTHIA BROWN,                          :    15 Civ. 4913 (RJS) (JCF)
                                        :
            Plaintiff,                   :         REPORT AND
                                        :         RECOMMENDATION
      - against –                        :
                                        :
COMMISSIONER OF SOCIAL SECURITY,         :
                                        :
            Defendant.                   :
- - - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE RICHARD J. SULLIVAN, U.S.D.J.:

      The plaintiff, Cynthia Brown, brings this action pursuant to

section 205(g) of the Social Security Act (the "Act"), 42 U.S.C.

§ 405(g), seeking review of a determination of the Commissioner of

Social Security (the "Commissioner") that she is not entitled to

Supplemental Security Income ("SSI").  The defendant has filed a

motion for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure, which the plaintiff has not

opposed.[1]  For the reasons that follow, I recommend denying the

Commissioner's   motion   and   remanding   the   case   for   further

proceedings.

_____

      [1] The plaintiff had until January 18, 2016, to answer the
Commissioner's motion.  (Order dated Oct. 15, 2015).  When the
plaintiff failed to respond by that deadline, I extended it to
March 18, 2016, and warned that, if she again failed to respond,
I would issue my recommendation based on the present record.
(Order dated Feb. 19, 2016).

Background

    A.  Personal History

    Ms. Brown was born on August 5, 1988, and filed her application for SSI benefits on October 16, 2012, when she was twenty-four years old. (R. at 6).[2] Before she was fired in approximately December 2010 following an altercation with her supervisor, Ms. Brown had worked as a laborer cleaning public parks. (R. at 98-100, 132-33). In her application, she alleged that she became disabled in February 2011 due to depression and bi-polar disorder.[3] (R. at 6). Ms. Brown attended school through the twelfth grade but has no specialized job training or vocational education. (R. at 132). As of January 2014, she lived with her

---

    [2] Citations to "R." refer to the Administrative Record that the Commissioner filed with the Court.

    [3] Although Ms. Brown alleged a disability onset date in February 2011, SSI benefits "can only be granted prospectively"; therefore "the only issue [to be decided] is whether [Ms. Brown] was disabled under the Act as of . . . the date of [her] application." Dehnert v. Astrue, No. 07 CV 897, 2009 WL 2762168, at *4 (N.D.N.Y Aug. 24, 2009) (collecting cases); 20 C.F.R. § 416.335. However, the Social Security Administration (the "SSA") is required to develop a claimant's "complete medical history," which includes at least the twelve months preceding the filing of an application. Price ex rel. A.N. v. Astrue, 42 F. Supp. 3d 423, 433 (E.D.N.Y. 2014) (quoting 42 U.S.C. § 423(d)(5)(B)). Because that medical history may provide "some evidence, at least circumstantial, that the [alleged impairment] had an element of continuity past the date of application," Dehnert, 2009 WL 2792168, at *5, I describe below medical records that both pre- and post-date Ms. Brown's application for SSI benefits.

boyfriend of five years and had two children who lived with her mother. (R. at 86, 91-92).

B. <u>Medical History</u>

1. <u>Richmond University Medical Center</u>

In early 2007, Ms. Brown was screened and treated at Richmond University Medical Center ("Richmond") due to "[c]onflicts with [] family" and "[o]ppositionality." (R. at 178). She was assessed on January 12, 2007, by Simcha Goldberg, a social worker. (R. at 178). Ms. Goldberg described Ms. Brown's presentation as well-groomed but irritable and emotional, with an angry demeanor, a belligerent attitude, and a depressed mood. (R. at 180-81). Her speech rate was slow and its quantity diminished and, although she was oriented to "[p]erson," "[d]ate," and "[p]lace," her long term memory, fund of knowledge, insight, and judgment were deemed "poor" and her intelligence "low." (R. at 180-81). Ms. Brown was not suffering from delusions or hallucinations and had no suicidal or homicidal ideation. (R. at 180-81). A functional assessment described Ms. Brown as "independent" in all categories. (R. at 182). Ms. Goldberg diagnosed disruptive behavior disorder, marked by immaturity and limited insight, and mild mental retardation, and scored Ms. Brown's Global Assessment of Functioning ("GAF") at

51.[4]   (R. at 181).   As treatment, Ms. Goldberg recommended
"behavioral modification and socialization [treatments]," and
noted that "[m]edications to control emotionality may also be
[appropriate]" and that Ms. Brown would start individual weekly
therapy sessions on January 30, 2007.  (R. at 185).

Robert Iadarola, a therapist at Richmond, developed a
comprehensive treatment plan for Ms. Brown on January 22, 2007.
(R. at 186-88).  Mr. Iadarola adopted Ms. Goldberg's diagnosis and
noted that Ms. Brown was "open at [their] initial session, freely
shar[ing] with [him]."  (R. at 186).   As treatment goals, he
identified stabilizing her mood and behavior and decreasing her
oppositionality through therapy sessions and, if prescribed by a
Dr. Garcia, medication.  (R. at 187).   A treatment attendance
chart shows that, between January 22 and March 20, Ms. Brown

---

[4] The GAF is a psychiatric assessment tool that generates a
numerical representation of a clinician's judgment as to a
patient's overall functioning along a continuum of mental health.
See American Psychiatric Association, Diagnostic and Statistical
Manual of Mental Disorders 16 (5th ed. 2013) ("DSM-5").   The GAF
was dropped from DSM-5 "for several reasons, including its
conceptual lack of clarity . . . and questionable psychometrics in
routine practice."   Id.   The GAF Scale provides scores from 1
("[p]ersistent danger of severely hurting self or others") to 100
("[s]uperior functioning in a wide range of activities").
American Psychiatric Association, Diagnostic and Statistical
Manual of Mental Disorders 34 (4th ed. text revision 2000) ("DSM-
IV").   A GAF score between 51-60 indicates "[m]oderate symptoms
. . . [or] moderate difficulty in social, occupational, or school
functioning."   DSM-IV at 34.

4

attended five sessions with Mr. Iadarola and missed four, and saw Dr. Garcia once for medication management.  (R. at 189).

A discharge summary prepared by Mr. Iadarola indicates that Ms. Brown stopped attending therapy on February 27; according to Ms. Brown's adoptive mother, she had left home and not been in contact.  (R. at 190).  After Ms. Brown could not be reached for several weeks, her case was closed; as of her discharge, Ms. Brown had not been prescribed medication and her GAF was 60.  (R. at 190).

### 2.  Lincoln Medical and Mental Health Center

On June 14, 2011, Ms. Brown received emergency psychiatric treatment at Lincoln Medical and Mental Health Center ("Lincoln"). (R. at 259-63).  At the time, she complained of "feeling depressed" and having "many stressors in [her] life" but denied any suicidal or homicidal ideation.  (R. at 261).  She was diagnosed with depressive disorder and discharged the same day in a stable condition without being prescribed any medication; a follow-up psychiatric evaluation was scheduled for July 13.  (R. at 263).

The plaintiff returned to Lincoln on July 22, 2011, after her ex-boyfriend called EMS because she "wanted to jump off the 8th floor [balcony]."  (R. at 247).  The admission records also note a history of self-cutting.  (R. at 247).  In her psychiatric assessment, the plaintiff was described as "labile" with impaired

impulse control and judgment, and she reported feeling depressed for "more than a month." (R. at 249). She reported symptoms including decreased appetite and sleep, a lack of motivation and "interest in life," and feeling overwhelmed. (R. at 250). The assessment concluded that Ms. Brown suffered from adjustment disorder with depressed mood and included a note to rule out mood disorder and major depressive disorder; her GAF was rated 45.[5] Her treatment plan included "inpatient stabilization," twenty-five milligrams of Zoloft daily, close observation, and supportive psychotherapy. (R. at 252).

After waiting several days for a bed in the psychiatric hospital to become available -- during which time her condition was stable (R. at 220-24, 267-81) -- the plaintiff was discharged on July 26. (R. at 239). Upon discharge, she not only appeared "calm and cooperative" and non-suicidal, she stated that "her ex-boyfriend had told her that she should go to the hospital and say that she is crazy so that she would be eligible for SSI." (R. at 239). She went on to explain that, after arriving at the hospital, "she did not like it and had told her boyfriend that she wanted to leave. [He] had told her that if she tried to leave and somebody

---

[5] A GAF score of 41-50 indicates "[s]erious symptoms . . . [or] any serious impairment in social, occupational, or school functioning." DSM-IV at 34.

called him, he would tell everybody that she had tried to cut her wrists." (R. at 239). The discharging doctor, Jorge Otero, checked the plaintiff's wrists and observed "no lacerations." (R. at 239). Dr. Otero concluded that Ms. Brown was not suicidal or homicidal and did not require inpatient psychiatric admission; instead, he made an appointment for a psychiatric screening on August 2 and prescribed Zoloft. (R. at 240). In his assessment, Ms. Brown suffered from depressive disorder, with a need to rule out both malingering and adjustment disorder with depressed mood. (R. at 240).

The plaintiff failed to attend her psychiatric evaluation in August, instead returning to Lincoln on February 8, 2012. She reported experiencing "anger outbursts" and "was adamant about needing med[ical] [treatment] as soon as possible due to anger outbursts and worry about her aggressive behavior." (R. at 217). The plaintiff explained that, while she used marijuana "once in a while" to self-medicate "her anger away," she wanted "to use prescribed medication to treat her anger instead." (R. at 218). The screening physician, Dr. Suzanne Hirsch, observed a "labile affect," "extreme crying spells," "rapid speech," and impaired judgment. (R. at 217, 219). The doctor diagnosed intermittent explosive disorder, indicated that cyclothymic disorder should be ruled out, and scheduled another a psychiatric evaluation. (R.

7

at 219).   On April 23, 2012, Dr. Hirsch closed the plaintiff's case, noting that she had, once again, failed to attend the follow-up appointment.   (R. at 237).

On September 14, 2012, the plaintiff presented at Lincoln for a "medication refill." (R. at 235).   The screening nurse noted that she was "independent with activities of daily living," her affect was appropriate, and her speech was normal.   (R. at 235-36).   She returned on October 12, 2012, for another medication refill.   (R. at 232).   She denied both hallucinations and suicidal ideation and was deemed clinically stable.   (R. at 232).   Again, the record indicated that the plaintiff was "independent with activities of daily living" and had an appropriate affect.   (R. at 233).

### 3.   FEDCAP Rehabilitation Services

The plaintiff presented at FEDCAP Rehabilitation Services, Inc. ("FEDCAP"), for an initial assessment on December 4, 2012, having been referred there by Lincoln "due to depressive symptoms and anger management issues." (R. at 638).   She reported "difficulty coping with conflictual relationship with [her] current boyfriend," which had triggered "sleep disturbance and crying spells," and explained that she struggled on a daily basis to cope with anger.   (R. at 638).   She further indicated that she had been non-compliant with her prescribed mental health treatment

8

at Lincoln's outpatient clinic.  (R. at 638).  The plaintiff was seen by Eric Erickson, a licensed clinical social worker, who observed that she was appropriately dressed and receptive.  (R. at 638).  That month, the plaintiff attended another two sessions with Mr. Erickson.  She reported similar symptoms, appeared "irritable and tearful," and stated that "[she] just can't control the way [she] feel[s]."  (R. at 634-35).  Mr. Erickson scheduled a psychiatric appointment so as to "obtain medication to stabilize [the plaintiff's] mood and sleep pattern."  (R. at 635).

Dr. Zahida Nayeem, a psychiatrist, saw Ms. Brown on December 18, 2012. (R. at 633).  During Dr. Nayeem's assessment, Ms. Brown reported experiencing the following for the past one or two years: (1) feeling irritable, depressed, and angry; (2) struggling to control her mood and impulses; (3) throwing things at her boyfriend, yelling and threatening him "for no apparent reason," and punching holes in the wall; (4) "cringing spells"; (5) mood swings and "labil[e] mood"; (6) inability to sleep at night; (7) using "loud[,] [] pressured speech"; (8) racing thoughts; and (9) "hyper[activity]."  (R. at 633).  Ms. Brown reported no suicidal ideation at the time and stated that she had not attempted suicide in the past but mentioned a time when she "tried to jump off a balcony . . . but did not do it."  (R. at 633).  She exhibited no signs or symptoms of psychosis and described a history of mental

9

illness in her family.  (R. at 633).  She could not recall the names of the medications she had used in the past and admitted to smoking marijuana one to two times a day "to make her feel good." (R. at 633).

Throughout 2013, Ms. Brown continued to attend sessions with Mr. Erickson, though she missed more appointments than she attended.[6]  While Ms. Brown often appeared stable and receptive during these sessions (R. at 593, 599, 601, 606, 611, 614, 616, 629, 630), Mr. Erickson observed on several occasions that she was "sad," "tearful," "irritable," or "agitated" (R. at 603, 608, 612, 622).  Ms. Brown referred often to episodes of anger, troubles in her relationships with others, and difficulties controlling her feelings.  (R. at 601, 606, 608, 611-12, 614, 616, 621, 625, 629, 630).  Mr. Erickson consistently observed that Ms. Brown appeared receptive to his treatment recommendations.

In addition to meeting with Mr. Erickson in 2013, the plaintiff was treated periodically by psychiatrists at FEDCAP.  On March 21, 2013, Dr. Janet Taylor identified the plaintiff's diagnosis as bipolar disorder and described her mood as "happy," her affect as "euthymic," her insight and judgment as "fair," and

---

[6] Specifically, Ms. Brown attended fifteen sessions (R. at 593, 599, 601, 603, 606, 608, 611-12, 614, 616, 621-22, 625, 629, 630) and missed twenty-two (R. at 594-97, 600, 602, 604-05, 607, 609-10, 613, 615, 617, 619-20, 623-24, 626-28, 631).

her impulse control as "good." (R. at 621). The plaintiff reported experiencing mood swings but denied both hallucinations and suicidal or homicidal ideation. (R. at 621). At the time, the plaintiff had not taken her prescribed medication (Depakote, which she said helped treat her symptoms) for over a week.[7] (R. at 621). Dr. Taylor continued the plaintiff's prescription. (R. at 621). On April 18, Dr. Taylor observed that the plaintiff was smiling, her mood was good, and her insight and judgment were improved. (R. at 618). The plaintiff again denied both hallucinations and suicidal or homicidal ideation. (R. at 618). Dr. Taylor again continued the prescription for Depakote. (R. at 618).

On October 30, 2013, Ms. Brown reported to Dr. Flavia Robotti that she had stopped taking Depakote since her most recent consultation with Dr. Taylor because "it did not work." (R. at 598). Ms. Brown's symptoms at the time included mood fluctuations and irritability; she denied delusions, hallucinations, and suicidal or homicidal ideation. (R. at 598). Dr. Robotti noted that the plaintiff was "well dressed [and] well groomed," that "[her] speech [was] relevant and coherent," that her affect was

---

[7] Ms. Brown told Mr. Erickson on January 12, 2013, that "[her] medication is helping her improve her mood despite continuously experiencing episodes of anger." (R. at 630). On March 16, Mr. Erickson "recommended [that Ms. Brown] reengage in medication management sessions." (R. at 622).

"broad[-]ranged and appropriate," that her insight and judgment were fair, and that her cognitive functions were within normal limits. (R. at 598). Dr. Robotti identified the plaintiff's diagnosis as bipolar disorder and prescribed Zyprexa. (R. at 598). Dr. Robotti saw the plaintiff again in December and remarked that she was "in a cris[is]," that her mood was "labile," and that she had been taking the Zyprexa "haphazardly." (R. at 592). The plaintiff denied suicidal or homicidal ideation and "d[id] not appear dangerous to self/others." (R. at 592). Although Dr. Robotti characterized the plaintiff's compliance with treatment as "poor," she renewed the Zyprexa prescription after the plaintiff "pledged" to take the medication regularly. (R. at 592). The plaintiff was to follow up with a Dr. Pell in one week. (R. at 592).

In addition to Mr. Erickson's treatment notes, the record also contains a Mental Capacity Assessment that he prepared. (R. at 640-43). Although the assessment does not provide a specific diagnosis, Mr. Erickson wrote that Ms. Brown has difficulty "establishing/sustaining personal relationships," that her memory is poor, and that she suffers from mood instability and anxiety. (R. at 642). Other than these brief remarks, the assessment consists of a series of boxes that Mr. Erickson checked off indicating the following: (1) no limitations in the plaintiff's

12

ability to sustain an ordinary routine or take precautions against normal hazards; (2) slight limitation in her ability to work with or around others without being distracted and to maintain socially appropriate behavior and standards of neatness and cleanliness; (3) moderate limitations in her ability to remember locations and procedures, to carry out short and simple instructions, to make simple work-related decisions, and to perform at a consistent pace with standard breaks; (4) marked limitations in her ability to understand and remember short and simple or detailed instructions, to carry out detailed instructions, to complete a workday without interruptions due to "psychologically[-]based symptoms," to ask simple questions or request assistance, to respond appropriately to changes in her work setting, and to set goals or make plans independently; and (5) extreme limitations in her ability to maintain attention for extended periods of time, to be punctual and maintain regular attendance, to complete a workweek without interruption due to her symptoms, to interact appropriately with the public, to accept instructions and respond appropriately to criticism, to get along with coworkers, and to travel in unfamiliar places or use public transportation.   (R. at 640-42).   Mr. Erickson also opined that Ms. Brown had experienced the limitations he identified since December 4, 2012, and that her symptoms would cause her to miss four or more days of work per month.   (R. at

13

641, 643).  Despite being prompted to do so, Mr. Erickson did not cite any "medical/clinical findings" to support his assessment. (R. at 640-42).

### 4.  Consultative Examination

On November 14, 2012, Dr. Fredelyn Engelberg Damari performed a consultative psychiatric evaluation of Ms. Brown.[8]  (R. at 282-86).  Ms. Brown reported numerous impairments to Dr. Damari, including difficulties eating and sleeping, "depression with dysphoric moods, crying spells, and diminished sense of pleasure," difficulties interacting with others, forgetfulness, and paranoia. (R. at 283).  Dr. Damari observed that the plaintiff was cooperative, though her "manner of relating and social skills w[ere] poor," and her "mood changed quickly during the evaluation." (R. at 284).  Dr. Damari further noted that Ms. Brown's affect was "[l]abile with depression," her mood was "[d]ysthymic and irritable," her insight was limited, and her judgment was poor. (R. at 284-85).  Ms. Brown's "memory skills" and "attention and concentration" were "impaired," and her cognitive functioning was deemed "below average."  (R. at 284-85).

---

[8] In assessing a claim for SSI, the SSA may require the claimant to undergo a "consultative evaluation" to "try to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision" on the claim.  20 C.F.R. § 416.919a(b).

Based on her examination, Dr. Damari concluded that, although the plaintiff "is able to understand and follow simple directions and instructions" and "to perform simple tasks independently," she "is significantly impaired in the ability to maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress." (R. at 285). Dr. Damari diagnosed bipolar disorder, not otherwise specified, with depressed mood, and personality disorder, not otherwise specified. (R. at 286). She concluded that the plaintiff's psychiatric problems "may significantly interfere with [her] ability to function on a daily basis" and characterized her prognosis as "guarded." (R. at 286).

### 5.   State Psychiatric Consultant

On December 4, 2012, state psychiatric consultant Dr. M. Apacible reviewed medical records from Lincoln and Richmond and Dr. Damari's evaluation. (R. at 10-13). Based on that review, Dr. Apacible determined that the plaintiff had moderate limitations in the following areas: (1) ability to remember locations and work-like procedures; (2) ability to understand, remember, and carry out detailed instructions; (3) ability to maintain attention and concentration for extended periods; (4) ability to perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances; (5) ability to sustain an ordinary routine without special supervision; (6) ability to work in coordination with or in proximity to others without being distracted by them; (7) ability to complete a normal workday and week without interruptions from her symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (8) ability to accept instructions and respond appropriately to criticism from supervisors; (9) ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (10) ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (11) ability to respond appropriately to changes in the work setting; and (12) ability to set realistic goals or make plans independently of others. (R. at 12-13). Dr. Apacible further opined that the plaintiff was capable of performing non-stressful unskilled work, noting that she would benefit from "a supervised work environment" but that she should not "have to work closely with others." (R. at 12-13).

### 6. Miscellaneous Records

The record also contains medical evidence from Jacobi Medical Center ("Jacobi") (R. at 201-16), Montefiore (R. at 300-529), and Dr. Ajith Karayil (R. at 531-90). Because these records relate

to Ms. Brown's physical rather than mental health, and because Ms. Brown indicated to the ALJ that her claim was based solely on her psychological condition (R. at 108), I only briefly summarize this evidence.

The plaintiff presented at Jacobi twice in August 2010.  On August 10, she arrived by ambulance to the emergency department complaining of right lower back pain "radiating to right suprapubic area" that had lasted two months and recently increased in frequency, duration, and degree.  (R. at 215).  An ultrasound scan of her abdomen and pelvis was performed, and she was discharged with a diagnosis of a urinary tract infection. (R. at 201-02, 209).  She returned on August 22 complaining of the same symptoms.  (R. at 207).

The Montefiore records span from June 2012 to October 2013.[9] During that period, Ms. Brown was treated at Montefiore for: (1) injuries she suffered, including swelling and bruising, after

_____

[9] Many of the Montefiore records refer to a patient named Cynthia Moskowitz, rather than Cynthia Brown.  Neither the Administrative Law Judge ("ALJ") in her written decision, nor the Commissioner in her brief filed in support of the present motion, mentions -- let alone attempts to explain -- this fact.  Because both sets of records use the same patient record number and date of birth (R. at 300, 465), and because the plaintiff listed Cynthia Moskowitz on her application as a name she previously used (R. at 130), I will assume the records referring to Cynthia Moskowitz describe treatment provided to Ms. Brown.  And, in any event, these records are irrelevant to the conditions at issue.

being assaulted on the street (R. at 305 (June 6, 2012)); (2) pain in her right shoulder lasting three days (R. at 398 (March 11, 2013)); (3) flank pain radiating to the pelvic area (R. at 372 (March 13, 2013); (4) pain in her right shoulder related to prior injury (R. at 358 (March 25, 2013)); (5) pain in her right flank (R. at 334 (March 26, 2013)); (6) flank pain "with radiation to abdomen" (R. at 497 (May 24, 2013)); (7) abdominal pain (R. at 465 (May 28, 2013)); (8) back pain (R. at 457 (May 30, 2013)); (9) chest discomfort, palpitations, dizziness, and loss of consciousness (R. at 441–45 (Aug. 22, 2013, and Sept. 4, 2013)); and (10) right hand and wrist pain caused by punching a wall (R. at 432 (Oct. 8, 2013)).

Dr. Ajith Karayil, a family practice physician, saw Ms. Brown numerous times between August 2011 and September 2013. (R. at 531-90). However, with the exception of a notation that Ms. Brown was prescribed Zoloft and suffered from depression (R. at 582), the records from those visits are devoid of references to Ms. Brown's mental health.

C.  Procedural History

The plaintiff filed her application for SSI benefits on October 10, 2012, alleging that she became disabled on February 1, 2011, due to depression and bipolar disorder.  (R. at 127, 131). After her application was denied on December 6, 2012, she requested

review by an ALJ, and a hearing was held on January 28, 2014, before ALJ Gitel Reich.  (R. at 43, 50, 88).  The plaintiff was represented at the hearing by Shayan Farooqi, an attorney.  (R. at 88).

Ms. Brown testified that she resided with her boyfriend and that her two children lived with her mother.  (R. at 91-92).  She indicated that she had neither worked nor looked for work since October 2012, but that she had previously been employed by the parks department until she was fired after she "got frustrated" with her supervisor and "literally attacked him."  (R. at 98-100).  Before that, she worked at McDonald's where she was fired because she could not "remember the way the system work[ed]" and because she was "not good counting change."  (R. at 100).

The plaintiff stated that she was presently taking Depakote to treat her depression and bipolar disorder but that the medication only helped "[s]ometimes" and that its effects wore off after an hour. (R. at 93).  After having worked with her therapist, Mr. Erickson, for "[a]bout a year," the plaintiff had recently begun seeing a different counselor.  (R. at 94, 97).  She described her depression as feeling "dark, lonely, [and] scared," and indicated that she cried without understanding why.  (R. at 107).  The plaintiff stated that her condition made her forgetful and made it difficult for her to focus on a task for more than

19

five minutes.   (R. at 104, 106).   The hearing ended rather abruptly when the plaintiff began crying.  (R. at 107-10).

On March 26, 2014, ALJ Reich issued a decision finding that Ms. Brown was not disabled within the meaning of the Act.  (R. at 20-30).  The Appeals Council denied Ms. Brown's request for review on April 17, 2015, making the ALJ's decision the Commissioner's final determination.  (R. at 1).  The plaintiff filed this action on June 22, 2015.

Analytical Framework

A.  Determination of Disability

A claimant is disabled under the Act and entitled to benefits if she can demonstrate, through medical evidence, that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); see also Arzu v. Colvin, No. 14 Civ. 2260, 2015 WL 1475136, at *7 (S.D.N.Y. April 1, 2015).  The disability must be of "such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

20

To determine whether a claimant is entitled to SSI, the Commissioner employs a five-step sequential analysis. 20 C.F.R. § 416.920(a)(4). First, the claimant must demonstrate that she is not currently engaging in substantial gainful activity. 20 C.F.R. § 416.920(a)(4), (b). Second, the claimant must prove that she has a severe impairment that "significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(a)(4)(ii), (c). Third, if the impairment is included in the portion of the regulations known as "the Listings," 20 C.F.R. Part 404, Subpt. P, App. 1, or is the substantial equivalent of such an impairment, the claimant is automatically considered disabled. 20 C.F.R. § 416.920(a)(4)(iii), (d). Fourth, if the claimant is unable to make the requisite showing under step three, she must prove that she does not have the residual functional capacity ("RFC") to perform her past work. 20 C.F.R. § 416.920(a)(4)(iv), (e). Fifth, if the claimant satisfies her burden of proof on the first four steps, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform. 20 C.F.R. § 416.920(a)(4)(v), (g); Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23 (S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)). In order to determine

21

whether the claimant can perform other substantial gainful employment, the Commissioner must consider objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and the claimant's educational background, age, and work experience. Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).

### B. Judicial Review

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled to judgment on the pleadings if she establishes that no material facts are in dispute and that she is entitled to judgment as a matter of law. See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743, 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A court reviewing the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence." Geertgens v. Colvin, No. 13 Civ. 5733, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); see also Longbardi, 2009 WL 50140, at *21.

Judicial review, therefore, involves two levels of inquiry.

First, the court must decide whether the Commissioner applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008). Second, the court must decide whether the ALJ's decision was supported by substantial evidence. Tejada, 167 F.3d at 773 (2d Cir. 1999); Calvello, 2008 WL 4452359, at *8. "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi, 2009 WL 50140, at *21 (citing Brown, 174 F.3d at 62, and Williams ex rel. Williams v. Bowen, 859 F.2d 255, 256 (2d Cir. 1988)). Substantial evidence in this context is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hahn, 2009 WL 1490775, at *6 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

Analysis

    A.  The ALJ's Decision

    ALJ Reich evaluated Ms. Brown's claim pursuant to the five-step sequential process and concluded that she was not disabled at any time since the alleged onset date. (R. at 20).

    At step one, ALJ Reich found that the plaintiff had not

23

engaged in substantial gainful activity since October 16, 2012. (R. at 22). She determined at step two that Ms. Brown's depression disorder, bipolar disorder, and behavior/explosive disorder constituted severe impairments, while her complaints of shoulder, back, flank, and chest pain were non-severe impairments. (R. at 22-23). At step three, she found that none of the plaintiff's impairments, alone or in combination, met or medically equaled the severity of any impairment included in the Listings. (R. at 23). Specifically, ALJ Reich found that Ms. Brown's impairments did not meet the criteria for either affective disorders (listing 12.04) or anxiety related disorders (listing 12.06). (R. at 23). That is, the ALJ determined that the plaintiff did not have at least two of the following: marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (R. at 23-24). Rather, she found that the plaintiff's limitations were, at worst, "moderate." (R. at 23-24). She also found that none of the "paragraph C" criteria were satisfied, as the medical evidence "d[id] not indicate that the claimant's mental impairments [] resulted in repeated episodes of decompensation, a residual disease process resulting in marginal adjustment, or a history of inability to function outside of a highly supportive

24

living arrangement."  (R. at 24).

Proceeding to step four, ALJ Reich concluded that Ms. Brown had the RFC "to perform medium work as defined in 20 C.F.R. 416.967(c) except [she] is limited to simple work that requires only occasional contact with people."  (R. at 24-25).  While she found that the evidence established that the plaintiff had medically determinable impairments that could reasonably be expected to cause the alleged symptoms, she also found that her statements concerning "the intensity, persistence[,] and limiting effects of these symptoms [we]re not entirely credible."  (R. at 25).

Finally, at step five, the ALJ determined that the plaintiff had no past relevant work, but that, taking into consideration her age, education, work experience, and residual functional capacity in conjunction with the Medical-Vocational Guidelines (the "Grids"), 20 C.F.R. Part 404, Subpt. P, App. 2, she was not disabled under the Act.  (R. at 29).

B.  RFC Determination

ALJ Reich concluded that Ms. Brown suffered from the severe impairments of depressive disorder, bipolar disorder, and "behavior/explosive disorder," and found that she had moderate difficulties in the areas of social functioning and concentration, persistence or pace.  (R. at 22-24).  However, while the ALJ

correctly explained that assessing the mental RFC of an individual (such as Ms. Brown) with "mental impairments" requires a "detailed assessment [] itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings," she failed to perform the required analysis.  (R. at 24).

When a claimant suffers from a mental impairment, the ALJ must employ a specialized assessment at each step of her sequential analysis.  Rosado v. Barnhart, 290 F. Supp. 2d 431, 437 (S.D.N.Y. 2003).  At step four, the ALJ must assess the claimant's mental RFC by engaging in a detailed assessment of the claimant's ability to perform a variety of work-related functions.  Pabon v. Barnhart, 273 F. Supp. 2d 506, 515-16 (S.D.N.Y. 2003); see also Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *4, 6 (July 2, 1996).  Specifically, a claimant's mental RFC "must be expressed in terms of work-related functions," addressing her capacity to (1) "understand, carry out, and remember instructions," (2) "use judgment in making work-related decisions," (3) "respond appropriately to supervision, co-workers[,] and work situations," and (4) "deal with changes in a routine work setting."  SSR 96-8p, 1996 WL 374184, at *6; accord Pabon, 273 F. Supp. 2d at 515-16.  Furthermore, the ALJ's RFC findings "must include a narrative discussion" that describes "how

26

the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence," and addresses "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis."  SSR 96-8p, 1996 WL 374184, at *7.

ALJ Reich's analysis of the plaintiff's capacity to perform work-related functions consists of one sentence: "The record evidence supports the finding that the claimant retains the ability to perform basic mental work activities."  (R. at 26).  While ALJ Reich goes on to summarize the evidence of Ms. Brown's mental impairments, she neglects to include any discussion of how that evidence supports her conclusion, let alone a "detailed assessment" of the plaintiff's ability to perform specific work-related functions.

More significantly, the ALJ's findings at step three, and much of the evidence she describes in her decision, are inconsistent with her finding that Ms. Brown "retains the ability to perform basic mental work activities."  For example, ALJ Reich concludes that the plaintiff's social functioning is moderately limited, citing evidence from Dr. Damari that Ms. Brown has difficulties "work[ing] in coordination with or proximity to others, interact[ing] with supervisors and co-workers, and respond[ing] appropriately to changes in the work setting."  (R.

at 23-24).   However, in explaining her assessment of Ms. Brown's mental RFC, ALJ Reich never accounts for these limitations, even though they clearly implicate the work activities that she deems Ms. Brown capable of performing.   Later, the ALJ notes that two different sources observed that the plaintiff is limited in her ability to maintain a schedule, deal with stress, and perform certain tasks independently.   (R. at 28).   Again, ALJ Reich neither discusses these limitations in connection with the relevant work-related activities nor accounts for them in her RFC assessment.   Cf. Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) ("Remand may be appropriate [] where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.").

By contrast, ALJ Reich correctly applies the relevant legal standard in assessing the plaintiff's exertional limitations, and her determination that the plaintiff is capable of performing work at the medium exertional level is supported by substantial evidence.   Although the plaintiff's medical records are replete with complaints concerning pain in in her shoulder, back, flank, chest, and hand, the ALJ correctly determined that the medical evidence does not support a finding that plaintiff suffers from significant physical limitations.   For example, although the

28

plaintiff complained in March 2013 of pain in her right shoulder (R. at 398), imaging revealed that her clavicle had healed from an earlier fracture (R. at 418-19), and she was discharged in "good" condition (R. at 409).   After examining Ms. Brown, Dr. Tony Wanich, an orthopedist, found no significant limitations and recommended "conservative treatment including physical therapy." (R. at 358-61).   Similarly, sonograms of the plaintiff's abdomen and pelvis, performed in connection with her complaints of flank pain, were unremarkable.   (R. at 517-18, 565).   After the plaintiff complained of chest discomfort, testing revealed no significant issues.   (R. at 435, 454-56).   The plaintiff herself did not report any physical limitations in a "function report" she completed. (R. at 144-45).

In light of the deficiencies in ALJ Reich's assessment of the plaintiff's mental RFC, I recommend remanding the case for further proceedings.

C.   Opinion Evidence

ALJ Reich considered opinion evidence from three sources -- Dr. Damari, Mr. Erickson, and Dr. Apacible -- and accorded each "[s]ome weight."   (R. at 28-29).   While none of the opinion evidence is entitled to controlling weight as the opinion of a treating physician, see 20 C.F.R. §§ 416.913(a) (identifying acceptable medical sources), 416.927(c)(2) (describing

circumstances where treating physician's opinion is entitled to controlling weight), the ALJ's explanation of the consideration she gave the opinion evidence is insufficient.

"[T]he crucial factors in any determination [made by the ALJ] must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). An ALJ's "failure to acknowledge relevant evidence or to explain its implicit rejection" is cause for remand. Kuleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)); see also Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 422 (S.D.N.Y. 2010) ("It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [her] reasoning to permit the reviewing court to judge the adequacy of [her] conclusions." (first alteration in original) (quoting Pacheco v. Barnhart, No. 03 CV 3235, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004))).

Although ALJ Reich explained that she found the opinion evidence "overly restrictive in light of the evidence" and that "the[] opinions may not accurately reflect the claimant's functioning . . . as she has a poor history of compliance with treatment," she never specified which aspects of the opinions she

30

accepted and which aspects she rejected.  (R. at 29).  Absent such specificity, there is no basis to assess whether her partial rejection of the opinion evidence was proper.  Moreover, it is impossible to infer from her findings which aspects of the opinion evidence the ALJ rejected; for example, while she credits Dr. Damari's opinion in her step three analysis (R. at 23-24), she implicitly rejects that same opinion when assessing the plaintiff's RFC by failing to include limitations Dr. Damari identifies.  I recommend that this case be remanded so that the ALJ can specify which portions of the opinion evidence she credits or rejects and provide valid reasons for doing so.

D. <u>Additional Considerations</u>

In light of my recommendation that this case be remanded, I note that the following issues merit additional consideration. First, ALJ Reich's stated reasons for discounting Mr. Erickson's opinion are unpersuasive.  The ALJ's finding that "[Mr. Erickson] has not interacted with [the plaintiff] on many occasions" because she missed numerous appointments ignores the fact that, between December 2012 and December 2013, Ms. Brown met with Mr. Erickson nineteen times.  (R. at 593, 599, 601, 603, 606, 608, 611-12, 614, 616, 621-22, 625, 629-30, 634-35, 637-38).  Moreover, while the ALJ is correct that a social worker is not an acceptable medical source, that is not reason enough to discount his opinion; indeed,

31

in some circumstances the opinion of a treating social worker may be entitled to greater weight than an opinion from an acceptable medical source.  See Canales v. Commissioner of Social Security, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010); SSR 06-03p, 2006 WL 2329939, at *5 (Aug. 9, 2006).  On remand, the ALJ should more carefully consider Mr. Erickson's opinion and, to the extent his opinion is incomplete, solicit from him any necessary clarification.  Finally, because the FEDCAP records show that the plaintiff has been treated there by an acceptable medical source, the ALJ should attempt to obtain an assessment from a treating source.  See generally Sanchez v. Colvin, No. 13 Civ. 6303, 2015 WL 736102, at *6-7 (S.D.N.Y. Feb. 20, 2015) (remanding because ALJ failed to obtain treating psychiatrist's opinion and noting that, for claimant suffering from bipolar disorder, "[a] treating psychiatrist's insights, which may capture what a one-time visit to a consulting psychologist cannot, would be obviously valuable").

Second, regarding the opinion of Dr. Apacible, "[t]he general rule regarding the written reports of medical advisors who have not personally examined a claimant is that such reports deserve little weight in the overall evaluation of disability" because an "assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination."  Cabibi v.

32

Colvin, 50 F. Supp. 3d 213, 236 (E.D.N.Y. 2014). This is especially true in this case because Dr. Apacible did not consider the plaintiff's treatment records from FEDCAP. In weighing Dr. Apacible's opinion, the ALJ should account for these factors.

Third, on remand, the ALJ's reassessment of Ms. Brown's mental RFC and the inclusion of additional non-exertional limitations may make reliance on the Grids at step five inappropriate. While the "mere existence" of a non-exertional impairment does not preclude reliance on the Grids, Bapp 802 F.2d at 605, the ALJ is required to consult a vocational expert when the claimant possesses non-exertional limitations that "significantly limit the range of work permitted by [her] exertional limitations," Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp, 802 F. 2d at 605).

Conclusion

For the foregoing reasons, I recommend denying the Commissioner's motion for judgment on the pleadings, vacating the Commissioner's decision denying benefits, and remanding the case pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra

copies delivered to the chambers of the Honorable Richard J. Sullivan, Room 2104, 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.  Failure to file timely objections will preclude appellate review.


                    Respectfully submitted,


                    _James C. Francis IV_____
                    JAMES C. FRANCIS IV
                    UNITED STATES MAGISTRATE JUDGE


Dated: New York, New York
       June 29, 2016

Copies transmitted this date to:

Cynthia Brown
55 W. 110th St.
Room 533
New York, NY 10026

Graham Morrison, Esq.
Social Security Administration
26 Federal Plaza, Room 3904
New York, NY 10278

Brandon M. Waterman, Esq.
Assistant U.S. Attorney
86 Chambers Street
New York, NY 10007